IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHAEL BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 13-cv-623-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Michael Brown, represented by counsel, seeks judicial review of the final agency decision denying him Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Mr. Brown applied for benefits in April, 2010, alleging disability beginning on April 3, 2010. (Tr. 10). After holding an evidentiary hearing, ALJ Michael Scurry denied the application on February 15, 2012. (Tr. 10-21). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 10.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ erred in failing to limit plaintiff to occasional reaching, handling and fingering.

2. The ALJ failed to consider whether he was entitled to a closed period of disability.

**Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

**C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Brown was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined that Mr. Brown had not been engaged in substantial gainful activity since the alleged onset date. He found that plaintiff had severe physical impairments of history of Type II C2 fracture and left pars fracture, surgically repaired with internal fixation, degenerative disc disease of the cervical spine, and obesity. The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ concluded that Mr. Brown had the residual functional capacity (RFC) to perform work at the sedentary exertional level, limited to only occasional stooping, kneeling and crouching and limited to no climbing of ladders, ropes or scaffolding. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past work. However, he was not disabled because

he was able to do other jobs which exist in significant numbers in the regional and national economies.  (Tr. 10-21).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1967 and was almost 43 years old on the alleged date of onset.  (Tr. 153).  He reported earnings of $7889.41 in 2009, the last full year he worked.  He made a little over $1400.00 in 2009, and had no earnings for the years 2005, 2006 and 2007.  (Tr. 146).

Mr. Brown suffered a fracture in his cervical spine in a car accident.  He stopped working on April 2, 2010.  (Tr. 158).

He had worked in the past as an assembly line worker, press operator, fork lift operator, box loader, and construction laborer.  (Tr. 159).  He has an 11th grade education.  (Tr. 157).

### 2. Evidentiary Hearing

Mr. Brown was represented by an attorney at the evidentiary hearing on February 3, 2012.  (Tr. 28).  He was 5'7" tall and weighed 230 pounds.  (Tr. 31).

At the time of his accident, he was working for Monsanto.  He was a forklift operator, machine operator and bagger.  (Tr. 35).

Plaintiff testified that there are years in which he had zero earnings because he could not find a job. Also, he spent a year prison about six years prior to the hearing for driving on a suspended license. (Tr. 36-37).

Plaintiff testified that he was unable to work because of pain in his neck, numbness on his left side and numbness in his right hand. (Tr. 39). After his surgery, he lost 80% of the movement in his neck. (Tr. 40). On a typical day, he does not do much except watch TV and walk around the house a little bit. His girlfriend and nephew did the household chores. (Tr. 40). Mr. Brown lived off-and-on with his girlfriend, who was the mother of his children. The children, aged five and four, also lived with the girlfriend. The girlfriend was not employed. (Tr. 32, 41-42).

A vocational expert (VE) also testified. The ALJ asked the VE to assume a person who could do sedentary work, limited to no climbing of ladders, ropes or scaffolds, and to only occasional stooping, kneeling and crouching. The VE testified that such a person would not be able to do plaintiff's past work. However, there are other jobs in the regional and national economies which he could do. Examples of such jobs are unskilled handpacker and production/assembler positions. (Tr. 50).

The VE testified that unskilled sedentary jobs "require frequent use of the hands and fingers." Therefore, if plaintiff were limited to only occasional reaching, handling and fingering with the bilateral upper extremities, he would not be able to do any jobs. (Tr. 51).

### 3. Medical Records

Mr. Brown suffered a Type II C2 fracture and left pars fracture in an automobile accident in April, 2010. The fractures were surgically repaired at Barnes Jewish Hospital in St. Louis, Missouri, on April 7, 2010. The surgery involved placement of a transarticular screw and grafting at C1-2. He was discharged from the hospital on April 14, 2010. One month later, he complained of bilateral occipital paresthesia and right fifth digit paresthesia in the ulnar nerve distribution. Dr. Yarbrough at Barnes Jewish found that his incision was healing well. He had full strength in the upper extremities, and somewhat diminished hand temperature on the right in the ulnar distribution. (Tr. 252-253).

Plaintiff was seen about every two months in follow-up in the neurosurgery clinic at Barnes Jewish. In July, 2010, the doctor noted that tone, power, and reflexes were normal in the upper limbs. Mr. Brown had "mild sensation in the ulnar distribution of his right arm and this is long-standing since his accident." (Tr. 413). In January, 2011, he complained of right-sided neck spasms and pain, but no new weakness or numbness. Cervical x-rays showed normal alignment with normal vertebral heights and no compression fractures. There was no segmental motion of the fused segments at C1-2. There was degenerative disc disease from C4-5 through C6-7. The doctor noted decreased light touch sensation in the right fourth and fifth digits which was "stable since the accident." He had palpable muscle spasms in the right posterior neck triggered by turning his head to the left and bending his neck forward. The doctor felt that the spasms and pain

might be related to a pseudoarthrosis, and ordered a CT scan to investigate.  (Tr. 397-400).

A cervical CT scan was done on February 4, 2011.  After reviewing the CT scan and examining plaintiff, the doctor at Barnes Jewish concluded that his fracture was well-healed and the screw was in place, although the fusion was not yet complete.  Sensation was grossly intact except for the right fourth and fifth digits.  The doctor thought it was unlikely that further surgery would give him a better outcome.  He recommended physical therapy and referred him to the pain clinic. (Tr. 386-392).

On the next visit, in June, 2011, he complained of neck pain and difficulty moving his neck.  On exam, sensation was intact to light touch.  Bilateral upper and lower extremities were 5/5.  He had no Hoffman's sign.  Reflexes were 2+, equal and symmetric.  The neurosurgeon did not recommend any further neurosurgical treatment, and advised him that he might continue to have persistent neck pain and limited motion.  He recommended that plaintiff continue with the pain management clinic.  Mr. Brown asked the doctor "to continue his disability for his neck pain."  The doctor told him that he "was not in a position to dictate that he is unable to work" and he was released to work "from a fracture standpoint."  Mr. Brown left "somewhat angrily."  He was to follow-up in the neurosurgery clinic as needed.  (Tr. 379-380).  Plaintiff did not return.

Mr. Brown was first seen in the Pain Management Clinic at Barnes Jewish Hospital on April 22, 2011.  He complained of pain on the right side of his neck

and shooting up the side of his head. He said he had numbness on the left side of his neck and in the fourth and fifth fingers on the right. On exam, the doctor noted decreased sensation to light touch in the left lateral neck and right fourth and fifth digits. The doctor increased the dosage of his Gabapentin and Baclofen, and encouraged continued physical therapy and weight loss. (Tr. 431-434). The last visit was in August, 2011. Mr. Brown was much the same. He had been unable to afford the increased dosage of Gabapentin. The doctor again noted decreased gross sensation in the "medial distal upper extremity." (Tr. 441-443).

Dr. Bashar Oustwani, Mr. Brown's primary care physician, also saw him regularly during the relevant time period. (Tr. 323-374, 445-450). Plaintiff complained of neck pain. The doctor did not record the results of neurological or sensory testing at every visit. In October, 2010, Dr. Oustwani told plaintiff he would have to sign a "narcotics contract" before he refilled his prescriptions for Vicodin, Xanax and Soma. Mr. Brown declined to take a urine test. (Tr. 360). In November, 2010, Dr. Oustwani noted that he had no sensory disturbances. (Tr. 353). In January, 2011, plaintiff continued to complain of neck pain. He had been referred for an orthopedic consult, but could not go because he did not have any insurance. (Tr. 344). At the last visit, on November 8, 2011, plaintiff told Dr. Oustwani that he had no neck pain and no neck stiffness. On exam, plaintiff had no tenderness to palpation of the neck and his neck was supple. There was no notation of any numbness or sensory disturbance. (Tr. 448-449).

### Analysis

Mr. Brown first argues that the ALJ erred in not limiting him to only occasional reaching, handling and fingering with the bilateral upper extremities. He points out that the VE's testimony established that, if such a limitation were included in the RFC assessment, Mr. Brown would be disabled. Plaintiff's argument is based on selected portions of the medical records and his own testimony.

Turning first to the credibility determination, plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as **Parker v. Astrue, 597 F.3d 920 (7th Cir. 2010)**, and **Brindisi v. Barnhart, 315 F.3d 783 (7th Cir. 2003)**. However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. See, **Pepper v, Colvin, 712 F.3d 351, 367-368 (7th Cir. 2013); Shideler v. Astrue, 688 F.3d 306, 310-311 (7th Cir 2012)**.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)**. "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." **Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Plaintiff does not take issue with any of the reasons cited by the ALJ. Rather, he argues generally that the ALJ should have more thoroughly analyzed his credibility. This is tantamount to no argument at all.

It is clear that ALJ Scurry considered the relevant factors. See, SSR 96-7p. He thoroughly reviewed plaintiff's medical treatment, noting that, after the initial surgery, his treatment was "fairly routine and conservative." He concluded that the medical records did not support plaintiff's claim of disabling pain. For example, he requested pain medication from Dr. Oustwani in October, 2010, but refused the doctor's request to take a urine test, and had not been prescribed narcotic pain medication since that time. The neurosurgery clinic released him to

return to work in June, 2011, to which he reacted angrily. On the last visit with Dr. Oustwani, he had no neck pain or stiffness. He claimed to have daily headaches, but almost always denied headaches to his doctors. (Tr. 15-17). Significantly, the ALJ acknowledged that some medical examinations showed decreased sensation in two fingers of the right hand, but he also noted that, on other occasions, plaintiff reported no sensory disturbances, no numbness or tingling, and no weakness. Doctors consistently noted that he had 5/5 strength in the upper extremities, including grip strength. The ALJ also considered the results of objective medical testing, including x-rays and cervical CT scan. (Tr. 17). Further, the ALJ took into consideration plaintiff's sporadic work history and the conflict between his allegations of extremely limited daily activities and the objective evidence. (Tr. 18-19).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." **Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009)**. The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." **Elder v. Astrue, 529 F.3d 408, 413-414 (7th Cir. 2008)**. Here, the analysis is far from patently wrong. It is evident that ALJ Scurry considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. **Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010)**. Therefore, his credibility determination stands.

Mr. Brown's argument based on the medical evidence can be swiftly disposed of. He does not argue that the ALJ overlooked medical evidence favorable to him. Rather, his argument amounts to a disagreement with the manner in which the ALJ weighed the evidence.

As is clear from the discussion above, ALJ Scurry undertook a detailed, and balanced, review of the medical records. Plaintiff's argument, in contrast, is based on a one-sided view of the medical evidence; he mentions only the entries which support his claim, and ignores the rest.

It is the function of the ALJ to weigh and decide any conflicts in the evidence, and this Court cannot substitute its judgment for that of the ALJ. **White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005).** After fairly considering all of the medical evidence, ALJ Scurry concluded that, while plaintiff suffered a serious injury, "the record of treatment shows that the claimant greatly improved." (Tr. 16). This conclusion is supported by substantial evidence, and the ALJ's discussion was more than sufficient to provide the required "logical bridge" between the evidence and his conclusion about plaintiff's RFC. **Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009).**

Plaintiff's second point, regarding a closed period of disability, is also not well-taken. He relies on the fact that the neurosurgeon did not "release" him to return to work until June 24, 2011, which was more than a year after his injury. Again, this argument is based on a highly selective view of the medical evidence. As

plaintiff was not seen in the neurosurgery clinic between February and June, 2011, the fact that he was not released until June is of limited significance. The ALJ explicitly found that plaintiff's "condition improved significantly in less than one year." He discussed in detail the medical evidence on which he based this conclusion. (Tr. 14-16). The failure to award a closed period of disability was not error.

In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether Mr. Brown was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. ***Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)**; ***Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)**. ALJ Scurry's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Scurry committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Michael Brown's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:**   July 2, 2014.


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**